**AMERICAN FEDERAL GROUP, LTD. and Dennis A. Herman, Plaintiff–Appellee–Cross–Appellant,**

**v.**

**Barnett ROTHENBERG, Defendant–Appellee–Cross–Appellee.**

**Nos. 96–7966, 96–9124.**

United States Court of Appeals, Second Circuit.

Feb. 6, 1998.

---

Before: McLAUGHLIN and JACOBS, Circuit Judges, and PHILLIPS *, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge:

Barnett Rothenberg appeals from a judgment of the United States District Court for the Southern District of New York (Theodore H. Katz, Magistrate Judge) entered following a six-day bench trial that awarded compensatory damages, with prejudgment interest, to his former corporate employer, American Federal Group, Ltd. (AFG), and his former business associate in AFG, Dennis A. Herman, on a finding that breach by Rothenberg of a post-employment non-compete covenant had caused financial loss to AFG and Herman. AFG and Herman cross-appeal from orders that prevented the prosecution of additional claims. We affirm on the cross-appeal, vacate and remand for further proceedings on Rothenberg's appeal.

## I. FACTUAL BACKGROUND [1]

In 1978, Herman and Rothenberg formed AFG to engage principally in the wholesale insurance underwriting business, essentially in continuation of a business that Herman had been conducting since 1973. AFG was formed as, and remained until Rothenberg resigned in 1991, a closely held corporation in which Herman and Rothenberg were the sole shareholders, directors and officers, Herman as President and Rothenberg as Vice–President. At the outset, Herman owned seventy-five percent of the outstanding stock of the company, Rothenberg, twenty-five percent; in 1982, their Shareholders' Agreement was amended to provide for Herman's permanent retention of sixty percent ownership in the company, Rothenberg's ownership of forty percent. This ownership division continued thereafter until Rothenberg's resignation in 1991.

Soon after AFG was formed, Herman and Rothenberg executed a Shareholders' Agree-

Joseph P. Dineen, New York City (Timothy B. Cummiskey, Goddard, Ronan & Dineen, on the brief) for Plaintiff–Appellee–Cross–Appellant.

Michael L. Allen, Newark, NJ (William S. Gyves, Adam S. Ravin, Saiber, Schlesinger, Satz & Goldstein, on the brief) for Defendant–Appellant–Cross–Appellee.

---

* The Honorable James Dickson Phillips, Jr., of the United States Court of Appeals for the Fourth Circuit, sitting by designation.

1. We recite here only those historical facts either undisputed, stipulated, conceded or found without challenge in the district court that serve to lay the general background of the litigation.

ment that contained two provisions of relevance to this litigation. One provision bound them not to engage in any business in competition with AFG so long as they were employed by that company and the other bound them to follow certain procedures in initiating and carrying out the dissolution and liquidation of the company.

Also, early in the company's life, management required certain key employees to sign, as a stated condition of their continued employment, letters containing an express post-employment non-compete covenant. The covenant provided in critical part that for a period of thirteen months following termination of employment by AFG, the employee would "refrain from soliciting or accepting ... any broker of record letter concerning any insurance policy or other type of insurance contract written by or through AFG as producer of record for a specific insured or group of insureds." The form letter used to exact these covenants recited that they were required by a "policy" established by the Board of Directors of AFG. Though both Herman and Rothenberg were aware that such a "policy" was being invoked to exact these covenants from "key" employees, neither ever signed one or requested the other to do so.

Through the mid-1980's, AFG grew and became a substantially profitable business, with approximately $2,000,000 in annual commissions and over thirty employees. During the period at issue, over ninety percent of its business involved the wholesaling of insurance to other brokers rather than the direct provision of insurance to insured parties. The company's special strength lay in its ability to secure at favorable rates in the London insurance market excess insurance coverage on special risks. Its primary source of insurance in that market, with Lloyd's of London and other special risk insurers, was through the brokerage firm of Thompson, Heath and Bond (THB), which dealt with AFG as its sole wholesale broker in New York City.

Business, and ultimately personal, relationships between Herman and Rothenberg began to go sour sometime in the mid-1980's. While the two parties inevitably disagree about causes and details, the origins of the trouble clearly trace to 1984 when Herman made a substantial investment as a limited partner in a real estate venture developing high-rise luxury apartments in Manhattan. At the outset of Herman's involvement, Rothenberg made no objection and in fact, at Herman's invitation, made a five percent limited partner investment in the venture in 1986. Tension between the two, however, developed and escalated as Herman's personal involvement in management of the real estate venture and corresponding withdrawal from AFG's operations increased. Whereas in 1984 he only devoted approximately twenty percent of his business time to the venture, problems that afflicted the venture in 1985 caused him to devote increasing amounts of time to it. By 1986, the problems had mounted to the point that Herman had physically relocated to the venture's location and Rothenberg had assumed full responsibility for the day-to-day operation of AFG. The stock market crash and resulting real estate development collapses of 1987 resulted in Herman's continuing to devote his full time to the real estate venture through 1989.

Now openly resentful about the matter, Rothenberg in 1988 demanded of Herman that their AFG salaries, then proportional to their ownership interests, be equalized. Herman agreed, but when in 1989 Rothenberg demanded that his salary be increased to $250,000 and Herman cease drawing any, Herman as majority shareholder rejected the demand and instead reduced both salaries in response to reduced AFG earnings.

By October of 1990, when Herman returned to his AFG management duties on a three-day-per-week basis, the parties had become openly hostile in their relationships. By early 1991, they began serious discussions about changing their business relationship. In July of 1991, Rothenberg made a formal offer to purchase Herman's interest in AFG. Though Herman rejected that offer as inadequate, negotiations for a buy-out by Rothenberg continued without success until, following an acrimonious meeting on September 26, 1991, Rothenberg declined to negotiate further. While the exact postures and motivations of the parties during this period of

negotiations are unclear and a matter of dispute between them, it is clear that no consideration was given to a dissolution of the corporation pursuant to provisions of the Shareholders' Agreement nor to a buy-out of Rothenberg by Herman.

In early October, 1991, the parties, with counsel, prepared a draft announcement to the AFG staff informing them of Rothenberg's impending departure and assuring them that AFG would continue in business. On October 18, 1991, Herman met with the staff and discussed Rothenberg's planned departure and its implications. On November 1, Rothenberg gave Herman formal written notice of his resignation as an officer and director, effective November 13, 1991. Rothenberg received his AFG salary through October, and left on November 13, 1991. Before his departure, he incorporated and obtained appropriate licensing for a company, Trinity Managers International, Inc. (TMI). Immediately after his departure, he began conducting through TMI a wholesale insurance business in direct competition with AFG.

During the course of the abortive buy-out negotiations leading up to Rothenberg's resignation from AFG and start-up of a competing business, the following events of significance to this litigation had occurred.

On September 1, 1991, while his negotiations with Herman were underway, Rothenberg went secretly to London where he met with David Ulph, AFG's primary contact at THB. The trip was deliberately concealed from Herman. Rothenberg instructed an AFG underwriter who knew of it not to tell Herman, and to conceal the fact he invoiced the trip under another employee's name.

On October 14, 1991, after having been told by Rothenberg of his impending resignation from AFG, Ulph advised Herman by letter that he was aware of Rothenberg's imminent departure and that when it occurred, THB's business would go with him. On the date of Rothenberg's actual departure from AFG, AFG was advised by fax transmission from THB that THB was terminating its relationship with AFG as of that day, November 13, 1991. Commencing shortly after that date and continuing over the next several months, AFG received broker of record letters from THB and from certain brokers who had been securing policies through AFG, advising that they were shifting their business to TMI.

During the critical period just before and following Rothenberg's leaving AFG, Susan Burnham, an AFG underwriter who joined Rothenberg at TMI immediately after its start-up in November of 1991, participated directly, at Rothenberg's request (or direction) in securing for TMI some of the AFG business that was transferred to TMI. While still employed at AFG, she copied, at Rothenberg's request, names and addresses of AFG broker clients with whom she had developed personal relationships in her AFG employment. When she joined Rothenberg at TMI, she brought with her AFG production records which indicated when AFG broker clients' accounts were to expire. Also available to her at TMI when she joined that company were AFG records indicating when policies with AFG clients came up for renewal. Using this information and her contacts acquired in AFG's employ, she secured some of the broker of record transfer letters from AFG to TMI, doing so in Rothenberg's name to avoid being personally charged with violation of the post-employment non-compete covenant which she had signed.

There is no direct evidence that Rothenberg himself ever directly solicited any AFG business for TMI while in AFG's employ. He denies that he did so, conceding only that if asked by an AFG broker client after he had decided to leave that company whether he intended to do so, he did not deny it; that after his planned departure from AFG had been announced to the AFG staff, he advised some AFG clients of his plans to go into a competitive business following his departure; and that at the close of business at AFG on the day of his departure, he made a general mailing announcing those plans to a number of AFG broker clients.

The broker of record letters transferred from AFG to TMI in the immediate aftermath of Rothenberg's departure from AFG represented a substantial loss of AFG's established commission business. Although

AFG was able in time to secure new access to the London market through another London brokerage firm, the access was more limited than that enjoyed through THB, so that AFG sustained significant financial loss as a result of losing its relationship with THB.

## II. DISTRICT COURT PROCEEDINGS

Because some procedural aspects of the proceedings in the district court bear significantly upon our consideration of this appeal, we recite those proceedings in some detail.

This diversity action was commenced by the filing of a complaint by AFG and Herman against Rothenberg on November 20, 1991. Six claims, all grounded factually in Rothenberg's conduct just before and following his departure from AFG were alleged: Claim 1, by AFG and Herman, sought injunctive relief for breach of fiduciary duties; Claim 2, by AFG and Herman, sought damages for breach of fiduciary duties; Claim 3, by Herman, sought damages for breach of the Shareholders' Agreement; Claim 4, by AFG and Herman, sought an accounting and constructive trust with respect to AFG business acquired by Rothenberg in breach of contractual or fiduciary duties; Claim 5, by Herman, sought specific performance of the Shareholders' Agreement; and Claim 6, by AFG, sought injunctive relief for breach of the post-employment non-compete covenant.

In a pre-trial consent order entered on September 2, 1994, following discovery and various proceedings on pre-trial motions, the claims for trial were identified as exactly the same six pleaded in the complaint.

Following assignment of the case by party consent for trial by Magistrate Judge Katz on March 21, 1995, Rothenberg moved *in limine* on May 17, 1995 to exclude as irrelevant to the claims identified for trial a num-ber of exhibits listed by AFG and Herman as intended, subject to rulings on noted objections by Rothenberg, for introduction at trial. In general, these exhibits concerned various sums of money that AFG and Herman asserted were wrongfully acquired by Rothenberg from AFG in a variety of ways during his employment by the company. Ruling that none of the transactions and occurrences to which the various exhibits related were relevant to any of the claims pleaded and identified in the pre-trial order, and concluding that to allow their introduction to prove essentially new claims after discovery had been closed would be unjust to Rothenberg, the magistrate judge granted the motion to exclude the exhibits as evidence at trial.

When the case then came on for bench trial on July 10, 1995, the record indicates that the court and parties both proceeded to trial on the assumption that only those claims seeking money damages now remained before the court for trial.[2] And the record also indicates, though without any formal ruling to the effect, that the magistrate judge assumed that those damages claims included not only Herman's claim for breach of the Shareholders' Agreement and the claim of AFG and Herman for breach of fiduciary duties, as to both of which damages had been expressly sought, but also the claim of AFG for breach of the post-employment non-compete covenant as to which only injunctive relief had been sought in the complaint, as confirmed in the pre-trial order.[3]

In the bench trial that followed, the evidence as to Rothenberg's liability under these claims was concentrated essentially on his conduct during the abortive buy-out negotiations with Herman and on his conduct, along with that of Susan Burnham, during the period leading up to and immediately following his departure from AFG on November 13, 1991. The evidence as to dam-

**2.** No formal abandonment or dismissal of the claims for injunctive relief and for an accounting and constructive trust appear in any of the record extracts included in the Joint Appendix filed in this court. It may be surmised that the claims for injunctive relief were considered mooted by the passage of time, and the relief available by accounting and constructive trust, abandoned as duplicative of that recoverable as damages. In any event, confinement of the trial to the claims for money damages is not challenged by any party on this appeal.

**3.** This is the clear import of the magistrate judge's opinion which, as more fully discussed later in this opinion, addressed each of these claims as a possible basis for an award of damages.

ages consisted essentially of conflicting expert opinions as to the financial loss—whether measured by impaired value of AFG's business or as lost earnings—resulting from the transfer of AFG insurance commission business to TMI.

In a comprehensive opinion issued on May 28, 1996, Magistrate Judge Katz found facts from which he concluded that: (1) Rothenberg had not breached the Shareholders' Agreement in any way alleged by Herman; (2) Rothenberg had breached the common law fiduciary duties owed AFG and Herman by pre-termination conduct that caused the transfer of AFG business to TMI; (3) Rothenberg also had breached the post-termination non-compete covenant by conduct within its thirteen-month period that caused a transfer of AFG business to TMI; (4) because specific business lost by AFG to TMI as a result of Rothenberg's conduct could be more confidently ascribed to his breach of the non-compete covenant than to his breaches of fiduciary duty, damages should be confined to those losses caused by breach of the non-compete covenant; and (5) those damages, as sufficiently proven by evidence of reasonably projected lost earnings, should be fixed on that basis, rather than on the basis of impaired value of AFG's business, which the court found not credibly proven. On this basis, the court entered judgment for AFG and Herman in the amount of $517,128, to which was added by later amendment prejudgment interest that brought the total to $662,630.89.

In a last procedural twist following trial, AFG and Herman requested leave to amend their complaint to add claims based upon the evidence that had been excluded in limine by the court. The letter-request suggested that the court might sever the added claims and "remand" them to a state court where another action between these parties was pending in order to protect against the bar of statutes of limitations. The request was denied.

Rothenberg then noticed appeal from the judgment awarding damages against him,

and AFG and Herman noticed a cross-appeal from the pre-trial order excluding their proffered exhibits and the post-trial order denying their motion to amend their complaint.[4]

## III. DISCUSSION

### A. The cross-appeal by AFG and Herman

The cross-appeal challenges the magistrate judge's related rulings which (1) excluded, on Rothenberg's in limine motion, certain trial exhibits listed by plaintiffs, with Rothenberg's objections noted, in the pre-trial order, and (2) later denied the plaintiffs' post-judgment letter-request for leave to amend their complaint to add claims to which the excluded exhibits related. We review both rulings for abuse of discretion, and find no abuse as to either.

■ As developed in an extensive hearing on the motion in limine, AFG and Herman intended to introduce the exhibits to prove that in various transactions and by various means, Rothenberg had wrongfully taken from AFG during his employment by that company sums totaling over $800,000. We agree with the magistrate judge's assessment, orally given at the hearing's conclusion, that because the transactions and occurrences to which the excluded exhibits related were not relevant to the claims in the case as pleaded and confirmed in the recently entered pre-trial order, to allow their introduction would amount to the addition into the case of new claims after discovery had been closed and just two weeks before trial, and that this would unfairly prejudice Rothenberg under the circumstances. As the magistrate judge properly noted, AFG and Herman had foregone the opportunity available from the outset of the case to seek addition of the new claims by formal amendment to their complaint. In consequence, neither they nor Rothenberg had sought any discovery respecting the transactions and occurrences to which the exhibits related and, as the magistrate judge properly observed, discovery respecting them would be critical to

---

4. Herman did not cross-appeal from the magistrate judge's dismissal of his claim for breach of

the Shareholder's Agreement.

their fair resolution. The magistrate judge also considered and properly rejected the contention by AFG and Herman that Rothenberg should be deemed to have consented to litigation of any claims to which the exhibits related by virtue of his counsel's participation without objection in settlement and other judicially supervised conferences in which it was manifest that AFG and Herman considered such claims to be properly in the case.[5]

We therefore agree with the magistrate judge's ultimate conclusion that, under the circumstances, to allow claims based upon these exhibits to be introduced into the case at that juncture would not be in the interests of justice. Surely, to so rule was not an abuse of the magistrate judge's carefully informed discretion.

■ For the same reasons, we cannot find abuse of discretion in the magistrate judge's denial of the post-trial motion by AFG and Herman for leave to amend their complaint to add new claims based upon the transactions to which the exhibits related. Aside from grave doubts about the validity of the suggestion advanced with the motion that the added claims could then be "severed" and preserved against time-bar defenses, we could not find it an abuse of discretion to rule that the post-trial motion for amendment came much too late even under the liberal standards enjoined by Fed.R.Civ.P. 15(a).

### B. Rothenberg's appeal

As indicated in our summary of the proceedings below, the magistrate judge determined that Rothenberg had both violated his fiduciary duty to AFG and Herman and breached the non-compete covenant which was enforceable against Rothenberg as an implied-in-fact contract. He then determined that the only damages proven with sufficient certainty as to either claim were those based upon lost earnings from commissions on business represented by broker of record letters transferred from AFG to TMI, and that these were most certainly recoverable on the basis of Rothenberg's breach of the implied covenant not to compete.

Reflecting an understandable uncertainty as to whether the award of damages was based upon breach of fiduciary duties as well as breach of implied non-compete covenant, Rothenberg challenges the imposition of liability in any amount under either theory and, in the alternative, the amount of the damages recoverable under either. We take these in turn, after first setting out in more detail the magistrate judge's analysis leading to the challenged rulings.

Addressing the breach of fiduciary duty claim, the magistrate judge first accurately identified the controlling legal principles under New York law. We summarize them here as the controlling principles for our application in review.

■ First, and fundamentally, one who, like Rothenberg, is a shareholder, officer and director of a closely held corporation, is under a duty "to deal fairly, in good faith, and with loyalty" to the corporation and other shareholders. See, e.g., Benson v. RMJ Sec. Corp., 683 F.Supp. 359, 375 (S.D.N.Y.1988). This requires that he exert his best efforts in behalf of the corporation and not compete with it or profit at its expense, or place his private interests in conflict with its. See Ability Search, Inc. v. Lawson, 556 F.Supp. 9, 15 (S.D.N.Y.1981), aff'd, 697 F.2d 287 (2d

---

**5.** AFG's contention before the magistrate judge that these claims had been the subject of discussions in various settlement and other conferences was made by counsel without any documentary support in the form of transcripts or other written record of the alleged discussions. Rothenberg's counsel, confronted with the unsupported characterization of the discussions, questioned the implications that were claimed for them by AFG and pointed out the particular irrelevance to the issues at hand of any discussions had in settlement conferences between counsel in pending litigation. The magistrate judge, noting the difficulty he faced in dealing with unsupported contentions about the nature and content of conferences at which he was not present, fairly concluded in effect that even assuming the claims at issue may have been discussed in the contexts generally asserted by AFG, this would not support a conclusion of implied consent by Rothenberg to litigate those unpleaded claims. Pressed at oral argument in this court for specific references to any record entry documenting the discussions relied upon by AFG to suggest implied consent, counsel could only refer this court to the hearing before the magistrate judge where the unsupported contention respecting the discussions was made.

Cir.1982). The scope of this fundamental duty is determined, however, by the circumstances of each case, and does not run to every act having any semblance of employee self-interest. *See Burg v. Horn,* 380 F.2d 897, 900 (2d Cir.1967). Thus, merely taking steps not involving any dereliction of positive duties to a current employer in preparation for engaging in competition with that employer after leaving its employ may not involve any breach of fiduciary duty. *See, e.g., Abraham Zion Corp. v. Lebow,* 593 F.Supp. 551, 571 (S.D.N.Y.1984) (filing for and obtaining trademark registration), *aff'd,* 761 F.2d 93 (2d Cir.1985); *Schneider Leasing Plus, Inc. v. Stallone,* 172 A.D.2d 739, 741, 569 N.Y.S.2d 126, 128 (1991) (incorporating later competing business). One, however, clearly crosses the line by going further in preparatory steps by actively soliciting the customers of his current employer and diverting his current employer's business to himself. *See, e.g., AGA Aktiebolag v. ABA Optical Corp.,* 441 F.Supp. 747, 754 (E.D.N.Y.1977).

 Further, the corporate opportunity doctrine prohibits a corporate employee from utilizing information obtained in a fiduciary capacity to appropriate a business opportunity belonging to the corporation. *See, e.g., Alexander & Alexander, Inc. v. Fritzen,* 147 A.D.2d 241, 246, 542 N.Y.S.2d 530, 533 (1989). And, this doctrine applies even after one owing fiduciary duties leaves his corporate employment. *See Abbott Redmont Thinlite Corp. v. Redmont,* 475 F.2d 85, 88 (2d Cir. 1973). The doctrine's application is limited, however, to business opportunities in which a corporation has a "tangible expectancy" which means "something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope." *Alexander,* 147 A.D.2d at 247–48, 542 N.Y.S.2d at 534 (quotation omitted).

 Finally, even former employees may not misappropriate and utilize confidential information, such as customer lists and other confidential information not generally known to the public, but available only to employees in their endeavors for the company. *See, e.g., Abraham Zion Corp.,* 593 F.Supp. at 569–70.

Applying these principles, the magistrate judge first dismissed as a possible breach of fiduciary duty the fact alone that Rothenberg had taken the preparatory step of incorporating and securing a license for TMI while still employed by AFG. But he then found clear breaches of fiduciary duty in two aspects of Rothenberg's pre-termination conduct. First, he found that by various contacts with Ulph of THB, particularly during his deliberately concealed trip to London, Rothenberg had let it be known that he planned to leave AFG and had sought and received assurances that when he did he, rather than AFG or Herman, would maintain the established relationship with THB which insured for him the valuable access to the London special risk business. This, the magistrate judge concluded, was "a breach of his fiduciary duty to AFG," constituting as it did an active diversion of AFG's business to his own business entity, TMI. *See AGA Aktiebolag,* 441 F.Supp. at 754.

Next, he found that Rothenberg breached his fiduciary duty by encouraging Susan Burnham to secure broker of record transfers from AFG to TMI, and by taking with him or having Burnham bring with her to TMI production reports and client expiration lists. Because these materials "belonged to AFG, not Rothenberg or Burnham," taking them for use by TMI constituted a breach of Rothenberg's fiduciary duty. *See, e.g., Abraham Zion Corp.,* 593 F.Supp. at 569–70.

Turning then to the contention that Rothenberg also had breached his fiduciary duty by soliciting, while still employed by AFG, the business of various insurance broker clients of AFG, the magistrate judge found this evidence "murkier." Conceding that there was no direct evidence of any specific solicitation by Rothenberg while still employed by AFG and that Rothenberg denied any, the magistrate judge nevertheless noted strong indirect evidence that there was such solicitation. There was Rothenberg's "less than credible testimony about his behavior in other contexts"; there was the fact that within a few days of Rothenberg's departure from AFG, "AFG began receiving virtually identical broker of record letters from different insurance agencies, transferring their business to Rothenberg's new venture"; and there was the fact that many of these letters

were transmitted by Ulph, some dated as early as November 14 and 15, 1991.

Observing that "[t]he content and timing of these letters strongly suggest that the brokers who issued them had initiated steps to withdraw their business from AFG before Rothenberg actually departed", and that, "[n]o doubt, this resulted from discussions with Rothenberg prior to his departure" that went beyond passively responding to self-initiated broker requests to accept their accounts, the magistrate judge opined that from all this he "could reasonably draw the inference that prior to his departure from AFG, Rothenberg solicited the business of at least some of its clients." Then, however, in an ambivalent observation that, as will appear, left the parties in obvious uncertainty as to his ultimate ruling on this issue, he opined that "in the end the record is less clear on whether Rothenberg breached his fiduciary duty to AFG in securing broker of record letters than it is on other acts of misconduct by Rothenberg" and that "[u]ltimately, however, Rothenberg can still be held responsible to AFG for the loss of the business accounted for by the broker of record letters." Two reasons for the latter conclusion were given: (1) because much of the business transferred to TMI by broker of record letters involved insurance secured by AFG through THB, "Rothenberg's improper disruption of AFG's relationship with THB can thus reasonably be viewed as a substantial factor in bringing about the loss of that business," and (2) "even if the broker of record letters were secured after Rothenberg left AFG, in accepting that business Rothenberg breached the AFG restrictive covenant to which he was bound."

Turning then to the post-termination non-compete covenant claim, the magistrate judge held that even though Rothenberg never had signed the covenant exacted from some key employees pursuant to the asserted corporate policy, he was bound by it as a contract implied in fact from his conduct and, alternatively, that he was estopped by that conduct from denying its enforceability against him. And, he found that, within the thirteen-month period of the covenant's duration, Rothenberg "accepted broker of record letters, transferring AFG business to TMI" in breach of that provision of the covenant which prohibited any employee bound by it from "soliciting or accepting ... any broker of record letter concerning any insurance policy ... written by or through AFG as producer of record."

■ Addressing the damages properly recoverable for either the found violations of fiduciary duty or the non-compete covenant, the magistrate judge first noted that AFG and Herman sought recovery both for the impaired value of AFG's business and for lost earnings caused by Rothenberg's conduct. Rejecting as flawed in methodology and too speculative the expert opinion evidence offered to prove impaired value, the magistrate judge found properly recoverable only those damages based upon lost profits.[6] Such damages, he accurately noted, are recoverable under New York law both for breach of contract, *see, e.g., Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. 693, 705 (S.D.N.Y. 1976), *aff'd,* 552 F.2d 447, 455 (2d Cir.1977), and for breach of fiduciary duty, *see, e.g., Stoeckel v. Block,* 170 A.D.2d 417, 566 N.Y.S.2d 625, 626 (1991). Properly noting that to recover damages for lost earnings or profits one must prove with certainty that the loss was caused by a breach of contract, *see, e.g., Kenford Co., Inc. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234 (N.Y.1986) (per curiam), or fiduciary duty, *see, e.g., Stoeckel,* 170 A.D.2d at 417–18, 566 N.Y.S.2d at 626,[7] and must

---

6. AFG and Herman do not challenge in this court the rejection of their claim for impaired value damages.

7. *Stoeckel* is representative of a line of New York cases applying in fiduciary duty cases a stringent injury causation requirement paralleling that applicable in contract breach cases. *See, e.g., R.M. Newell Co., Inc. v. Rice,* 236 A.D.2d 843, 653 N.Y.S.2d 1004, 1005 (1997) (causal link re-

quired); *105 East Second St. Assoc. v. Bobrow,* 175 A.D.2d 746, 746–47, 573 N.Y.S.2d 503, 504 (1991) (same). There is another line, represented, *e.g.* by *Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (N.Y.1969), and recognized as controlling New York law by this court in such cases as *e.g., Evvtex Co., Inc. v. Hartley Cooper Assocs. Ltd.,* 102 F.3d 1327, 1334 (2d Cir.1996), that applies a less stringent, "substantial factor" causation requirement.

prove with reasonable certainty, though not mathematical precision, the amount of the loss, *see, e.g., Ashland Mgmt. Inc. v. Janien,* 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 915–16, 624 N.E.2d 1007 (N.Y.1993), the magistrate judge then concluded that only the loss of commission revenue represented by the broker of record letters transferred from AFG to TMI immediately following Rothenberg's leaving AFG met these proof requirements of causation and amount.[8] Specifically respecting that loss, the court concluded that it warranted recovery of the sum of $517.128. This was computed by taking the total annual commission revenues represented by the transferred broker of record letters as $444,-000 (rounded), assuming a retention rate on existing business of 70%, applying an earnings margin of 60% on business renewed at that rate from year to year, and projecting the resulting discounted figures forward for five years.

There remained the question whether damages for these sufficiently proven lost earnings could be awarded for any found violation of fiduciary duty, or for the found breach of the implied non-compete covenant (or, theoretically, for both in the alternative). On that question, the magistrate judge's opinion is at best unclear—with critical consequences for this appeal. The problem of causation was the principal concern. With damages limited to the losses represented by the transferred broker of record letters, applicable damages law required that the transfers be traceable to specific conduct of Roth-

enberg that either violated his fiduciary duty, or breached the implied covenant, or did both. In addressing that causation question, the magistrate judge's opinion equivocates. We will have to return to the exact nature and consequences of the equivocation in later discussion. It suffices at this point to say only that the court found causation sufficiently proven with respect to Rothenberg's breach of the implied non-compete covenant and less clearly proven with respect to any of the found pre-termination breaches of fiduciary duty, so that judgment could most confidently be entered on the basis of the former.

We turn now to Rothenberg's specific assignments of error.

1. *Liability for breach of the implied non-compete covenant*

Without questioning whether the conduct found to have breached the implied non-compete covenant was properly found as fact or whether, if properly found, it would have breached the covenant, Rothenberg contends more fundamentally that such a covenant was not, as a matter of law, enforceable against him. He argues, alternatively, that (1) it could not properly be implied under controlling New York law which disfavors, as a matter of policy, the implication of post-employment non-compete covenants; (2) its enforcement is barred by New York's statute of frauds; (3) it is unenforceable because its subject matter is directly addressed in the express written Shareholders' Agreement;

---

The magistrate judge here gave as the controlling standard, with appropriate citations, the less stringent "substantial factor" requirement, but also recognized *Stoeckel's* application of the more stringent contract-breach standard. In the end, however, as will appear, the magistrate judge applied the more stringent standard in finding the requisite causal link for establishing liability under the implied covenant claim. He did not, therefore, directly address which of the two lines of authority in fiduciary duty cases should apply in this case.

The two lines of cases are perfectly reconcilable, though the cases cited seem not to have attempted reconciliation between the two. They are principally distinguishable by the remedies being sought. *See generally* 2 Dan B. Dobbs, *Law of Remedies* § 10.4, at 668 (1993). Where, as in *Stoeckel* and this case, the remedy sought is damages to compensate for a claimant's loss, the

usual damages-causation rule for tort and contract breach cases is appropriate; where, as in *Diamond* and *Evvtex,* the remedy being sought is a restitutionary one to prevent the fiduciary's unjust enrichment as measured by his ill-gotten gain, the less stringent "substantial factor" standard may be more appropriate. In this case, as in *Stoeckel,* the remedy being sought is compensatory damages measured by the claimant's loss, so that the appropriate injury causation standard, whether the remedy is sought for violation of fiduciary duty or breach of covenant, is the more stringent one.

**8.** In so concluding, the magistrate judge specifically declined to allow any recovery based upon lost commission business not represented by these broker of record letters. AFG and Herman do not challenge that ruling on this appeal.

and (4) it is unenforceable by virtue of a merger clause in the Shareholders' Agreement.

We need not address the two contentions based upon the Shareholders' Agreement because we agree with Rothenberg's other two: that such a covenant could not properly be implied under New York law, and that, in any event, enforcement of the one implied here is barred by that state's statute of frauds.

▮ As this court has noted, New York courts take "a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." *American Inst. of Chem. Eng'rs v. Reber–Friel Co.*, 682 F.2d 382, 386 (2d Cir.1982) (quotations omitted). The New York Court of Appeals has indeed put it flatly that "[a]lthough in a proper case an implied-in-fact covenant not to compete for the term of employment may be found to exist, *anticompetitive covenants covering the postemployment period will not be implied.*" *American Broadcasting Companies v. Wolf*, 52 N.Y.2d 394, 406, 438 N.Y.S.2d 482, 488, 420 N.E.2d 363, 369 (1981) (emphasis supplied).

▮ In holding that such a covenant might properly be implied here, the magistrate judge did not advert to the New York policy specifically disfavoring post-employment anticompetitive covenants, relying only on decisions dealing with implied contracts in

various other contexts. AFG and Herman have not brought to our attention any New York decision specifically implying a post-employment covenant or drawing in question the continued vitality of the general policy disfavoring their implication that was recognized in *Reber–Friel* and *Wolf*. We therefore assume the continued authority of those cases and on that basis conclude that the magistrate judge erred as a matter of law in implying the covenant here.[9]

▮ We also conclude that, aside from the general policies against implying such covenants, the particular covenant implied here could not be enforced against Rothenberg under New York's statute of frauds which, in relevant part, makes "void" "[e]very agreement, promise or undertaking" which "[b]y its terms is not to be performed within one year from the making thereof," "unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith." N.Y.Gen. Oblig.Law § 5–701 (McKinney 1989). Noncompete covenants having the requisite duration, as does the thirteen-month covenant implied here, are covered by this provision. *See, e.g., McKay v. Communispond, Inc.*, 581 F.Supp. 801, 806 n. 5 (S.D.N.Y.1983). If the covenant signed by others in this case can be taken as a "memorandum in writing" of the implied covenant, it nevertheless is "void" as to Rothenberg because, indisputably, he never subscribed any such covenant.

▮ AFG attempts to avoid application of the statute of frauds on the basis that

9. We further observe that even if New York's prohibition against implication of such covenants is not as absolute as it was stated to be in *Wolf*, we are satisfied that the policy would not allow implication in situations as ambivalent as that revealed here. In the first place, the record is extremely murky about the exact nature and source of the "policy" said to lie behind and to require the execution of covenants not to compete by "key employees, including officers." Pressed at trial to identify any corporate resolutions or by-laws devoted to that subject or to any but banking matters, Herman, the corporate president, a director and majority shareholder, could not do so. From related testimony concerning the matter, it seems most likely that the "policy" was an informal one devised ad hoc by corporate counsel in response to an incident of post-employment competition by a former employee; that it never was formally expressed except in letters sent to certain underwriters, including Susan Burnham, to explain why the covenant was being exacted from them "as a condition of continued employment;" and that though both Herman and Rothenberg were obviously aware that on the asserted authority of such a "policy" covenants were being exacted from certain key underwriters, neither assumed, certainly neither requested, that a comparable covenant should be exacted from either of them.

For the same reason, we conclude that the magistrate judge erred in holding that Rothenberg's conduct vis-a-vis this "policy" and the covenants exacted on its basis from others, equitably estopped him from contesting its applicability to him.

it is an affirmative defense which was waived by Rothenberg's failure to plead it as required by Fed.R.Civ.P. 8(c). Waiver by failure to plead is indeed the general rule, but it is a rule "not applied automatically and as a practical matter there are numerous exceptions to it." 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1278, at 491 (2d. ed. 1990) (citing cases). Critical among those exceptions is one applicable here: that waiver may not be proper where the defense is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party. *See, e.g., Lucas v. United States,* 807 F.2d 414, 418 (5th Cir. 1986). Here, as earlier noted in Part II, AFG's claim of breach of the non-compete covenant sought only injunctive relief, and at trial both parties and the magistrate judge proceeded on the assumption that only those claims seeking damages remained for trial. In that situation, as Rothenberg plausibly contended in this court, it was only when the magistrate judge unexpectedly entered judgment awarding damages on the breach of covenant claim (actually, only when the judgment was later "clarified" in a post-judgment hearing as resting solely on that claim, Appellant's Br. at 17 n. 5) that the applicability of the statute of frauds defense to that claim first assumed critical importance. While this contention glosses over the fact that the defense could have been pleaded even when the claim sought only injunctive relief, and that it could have been raised in a post-judgment motion to amend the "clarified" judgment, we nevertheless think it is well taken. Under the circumstances, Rothenberg justifiably could have assumed up until the judgment was entered and later "clarified" that the breach of covenant claim was out of the case, *see supra* note 2, so that his first effective opportunity to raise the statute of frauds defense arose only then. When he did then

raise it in his brief in this court, it presented a pure question of law requiring no further factual development for its resolution, so that it could be, and was, fairly addressed by AFG in brief and oral argument in this court. We therefore conclude that the defense should not be deemed waived by procedural default.

 Aside from this rejected procedural objection, AFG challenges application of the statute of frauds only on the unsupported, and insupportable, assertion that the defense is not available against "implied-in-fact" contracts. Appellee's Br. at 25. That, of course, cannot be, and we therefore conclude that the statute of frauds provides an independent basis for rejecting the magistrate judge's determination of liability for breach of an implied covenant not to compete.[10]

### 2. Liability for breach of fiduciary duty

On the prudent assumption that the damage award may have been based alternatively upon the found breaches of fiduciary duty, or that affirmance by this court might in any event be sought on that basis, Rothenberg challenges the imposition of liability in any amount under that theory. Specifically, he contends (1) that the magistrate judge erred as a matter of law in one of its findings of breach of fiduciary duty in Rothenberg's pre-termination conduct, and (2) that there was insufficient evidence of the required causal link between the breaches found and the specific losses for which damages were awarded to support any award.

AFG and Herman in response contend that the judgment in their favor may properly be affirmed on this alternative basis and they directly contest Rothenberg's two challenges to its entry on that basis. In this posture of the appeal, whether or not the judgment was in fact entered on this alternative basis, AFG and Herman as appellees

---

10. There are other problems with the entry of a judgment for damages on this claim. As earlier noted, the only remedy specifically sought in the complaint and pre-trial order respecting this claim was an injunction. In addition, the judgment for damages as entered was a joint judgment for both AFG and Herman, though this claim was only brought by AFG. These are possibly only curable procedural irregularities that

might not, singly or together, warrant vacatur of an otherwise valid judgment. But they are intertwined with the substantive problems discussed in text and probably explain some of the confusion that obviously attended the magistrate judge's handling of the factually interrelated breach of fiduciary duty and breach of covenant claims.

properly may urge affirmance on that alternative basis. *See SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943). We must therefore address that counter-contention by appellees in considering Rothenberg's specific challenges.

### a. *Legal error in finding fiduciary duty breach*

■ Rothenberg's challenge to the findings of specific breaches of fiduciary duty is a narrow one. It addresses only the finding that "he improperly usurped AFG's relationship with THB." And it challenges that finding only on the legal basis that, "as a matter of law AFG lacked the requisite 'tangible expectancy' in retaining the THB relationship," to meet the requirements of the "corporate opportunity" doctrine. Specifically, the contention is that in the highly competitive insurance industry in which they were engaged, AFG had no "tangible expectancy" that it could indefinitely retain the "usurped" THB relationship, so that to "usurp" it violated no fiduciary duty.[11] Appellant's Br. at 18, 31–36.

To the extent Rothenberg's contention is that the lack of "tangible expectancy," hence of "corporate opportunity," in AFG's maintenance of the THB relationship was established as a matter of law on the evidence of record, we disagree. Rothenberg relies principally upon *S.W. Scott & Co., Inc. v. Scott,* 186 A.D. 518, 174 N.Y.S. 583 (1919), for the proposition that in a highly competitive insurance brokerage business such as that involved in this case, there can be no "tangible expectancy" in the indefinite continuation of such relationships. We do not understand *Scott* to lay down any such general rule for the insurance—or any other concededly competitive—industry. *Scott* did reject a breach of fiduciary duty claim based upon allegations of improper solicitations by a corporate officer of his employer's insurance clients. But, it did not do so on the basis that a "tangible expectancy" could never exist in the insurance industry because of its highly competitive nature. Special relationships giving rise to the requisite expectancies may of course arise even in highly competitive business contexts. In *Scott,* no such special relationship was suggested; the only expectancy of continued corporate opportunity was whatever could be inferred from general business practices, and in that highly competitive business, those did not rise to the level of "tangible expectancy." *See Abbott Redmont,* 475 F.2d at 88–89 (so distinguishing *Scott* from case involving diversion of corporate opportunity by former employee who was, as to that particular opportunity, the sole competitor).

We therefore reject Rothenberg's contention that Rothenberg's "usurpation" of the THB relationship could not, as a matter of law, constitute a breach of fiduciary duty. We do not, however, hold to the contrary that as a matter of law it did. Whether it did or did not depends upon whether, as a matter of fact, the requisite expectancy existed by virtue of any special relationship that may have developed between AFG and THB. Presumably because he had concluded to base liability upon breach of implied covenant, the magistrate judge did not address that factual issue—certainly not as directly as was needed, Rothenberg having raised the issue.

On the present record, this remains an open, unresolved issue of fact to whose resolution in further proceedings we will return.

### b. *Insufficient evidence of damage causation*

■ Invoking the requirement that to recover damages for lost earnings on a breach of fiduciary duty claim one must prove with certainty that any losses sustained were caused by the breaches alleged, *see Stoeckel,* 170 A.D.2d at 417–18, 566 N.Y.S.2d at 626, Rothenberg contends that there is not such proof in this record. Specifically, he points out that, as the magistrate judge recognized, there was no direct evidence that Rothenberg ever solicited any of AFG's insurance

---

11. This challenge does not therefore reach the magistrate judge's express findings of other breaches of fiduciary duty, specifically: Rothenberg's enlistment of Susan Burnham to secure broker of record transfer letters from AFG to TMI, and Rothenberg's taking, or having Susan Burnham take, AFG production reports and client expiration lists to TMI.

broker clients during his employment by AFG. And, he further points out that the magistrate judge made no specific finding of the requisite causal link between any of the breaches of fiduciary duty that he did find and any of the broker of record transfers upon which the damages award was based.

Against this conceded lack of any direct evidence of pretermination breach by solicitation and of any specific breach-damage causation findings, there are, however, some countervailing intimations of what might have been found had not the magistrate judge concluded that liability could more soundly be based upon breach of an implied covenant. In opting to give judgment on that basis, the magistrate judge did not affirmatively find the required causal link not present with respect to the fiduciary duty claim, but only that it could more confidently be found with respect to the implied covenant claim. And, though he declined in the absence of direct evidence to find any pretermination solicitation of AFG clients by Rothenberg, the magistrate judge opined that from the circumstantial evidence before him he "could reasonably draw the inference that prior to his departure from AFG, Rothenberg solicited the business of at least some of its clients." Beyond these intimations of what might have been found had not the magistrate judge erroneously concluded that it was not needed, there are also some critical unchallenged findings that at least point in the direction of the required causal link. These include the findings that while still employed by AFG, Rothenberg had Susan Burnham actually effect some of the broker of record transfers at issue; that either Rothenberg, or Burnham at his direction, or both, took with them to TMI AFG production records and client expiration lists that could aid in soliciting such transfers; and that within thirteen months after his departure from AFG, Rothenberg at TMI acquired some of the former AFG insurance broker business for whose loss damages were awarded.

From these findings and "near-findings," AFG and Herman in effect invite us to draw the necessary inferences that the magistrate judge intimated might be drawn and on that basis affirm the judgment on this alternative ground. There is enough of substance in the possibility that we have given it serious consideration. In the end, however, we conclude that to justify even partial affirmance on this alternative basis would require an improper incursion by this court into first-instance fact-finding. Cf. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985) (emphasizing, in discussing clearly erroneous standard of review, impropriety of appellate incursions into fact-finding function of trial courts).

This does not, however, lead to the opposite conclusion urged by Rothenberg—that because the present record does not permit affirmance on this alternative basis, it should now be ruled out as a possible basis for any recovery of damages. We believe another course is proper.

Our review of the record persuades us that the magistrate judge failed, for the reason suggested, to give the fiduciary duty claim the full consideration to which AFG and Herman are entitled. They had pleaded and pursued it throughout the district court proceedings as an alternative basis for recovery of the monetary relief they claimed. They have properly continued as appellees in this court to pursue it as an alternative basis for relief. They are therefore entitled to have the claim thoroughly considered in the first instance—as it has not yet been—in the district court. Accordingly, in exercise of our appellate power under 28 U.S.C. § 2106 to "remand [a] cause and ... require such further proceedings to be had as may be just under the circumstances," we will remand the fiduciary duty claim for consideration under instructions to be given.

### 3. *The damages award*

Rothenberg contends that even if liability is affirmed under either theory, the damage award based upon lost earnings is tainted by legal and fact-finding errors that require either outright reversal of the judgment or vacatur of the damage award and remand for reconsideration. Appellant's Br. at 36, 48.

Specifically, he contends (1) that the evidence of AFG's lost earnings was too specu-

lative to meet the substantive requirement that the amount of damages be proved with reasonable certainty and (2) that the findings of fact as to the amount of earnings lost were clearly erroneous. Though we are vacating the judgment and remanding on other grounds, we address the issues raised because of their bearing on decision in remanded proceedings.

■ The contention that the evidence of lost earnings was too speculative to support any award is based essentially on the dearth of any hard evidence of AFG's established earnings history. Rothenberg asserts that this is the most reliable (and perhaps only) basis for determining an established business' loss of profits. We reject this contention.

■ The magistrate judge noted the lack of earnings history evidence and, largely because of its absence, declined to award damages based upon the impaired value of AFG's business resulting from Rothenberg's conduct. But, when making the quite different assessment of lost profits by looking directly to the commission revenue lost by the broker of record letter transfers, the court considered the evidence sufficient, without any need for previous earnings history, to prove those damages with sufficient certainty. Specifically, the court considered the proof methodology employed, which projected over a five-year period the total annual commission revenues reflected in the transferred broker of record letters, discounted for retention and earnings rates, sufficient for the purpose. There was no legal error in relying upon this method of proof to establish lost profits under the circumstances of the case. Hard evidence of a claimant's earning history may surely be an aid to proof of lost profits, but as surely it is not a *sine qua non* for such proof. Indeed, in many cases, the most probative evidence of lost profits may well be exactly that utilized by the methodology employed here: direct evidence of earnings specifically diverted from a claimant by culpable conduct of another which, but for the diversion, would have come to the claimant. There is no *per se* rule of damages law that lost profits may not be proved in this way,

nor that such proof must always include a claimant's earnings history.

■ Rothenberg's other challenge to the damages awarded on the basis of this methodology is that the magistrate judge's acceptance of the methodology's critical premises of a 70% retention-of-business rate and a 60% earnings rate were based upon clearly erroneous fact findings as to those rates. We cannot declare those findings clearly erroneous. They were based on conflicting evidence and involved mathematical computations which Rothenberg argues are demonstrably wrong as mathematical fact. We are satisfied, however, that the retention and earnings rate figures accepted by the magistrate judge are "plausible"—though surely not inarguable—inferences from the evidence. We cannot, therefore, reject them and the computations based upon them as clearly erroneous. *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511–12.

## IV. CONCLUSION

On the cross-appeal by AFG and Herman, we have rejected their positions and will affirm the orders challenged by the cross-appeal.

On Rothenberg's appeal, we have found legally erroneous the magistrate judge's determination of liability and award of damages for breach of an implied non-compete covenant, and have concluded that the magistrate judge's findings of fact respecting the breach of fiduciary duty claim are insufficient to allow affirmance of the judgment on that alternative theory. For that reason, we must vacate the judgment awarding damages against Rothenberg. Because, however, we have also concluded that the course of proceedings below was such that AFG and Herman are entitled to have their breach of fiduciary duty claim reconsidered by the district court, we are remanding that claim for further proceedings in light of this opinion.

In remanding that claim, we offer the following observations and instructions for guidance of the district court.

Two subsidiary holdings of this court control as law of the case in further proceedings. First, that whether AFG had the requisite

"tangible expectancy" in maintaining its former business relationship with THB to support a conclusion that Rothenberg's found "usurpation" of that relationship constituted a breach of fiduciary duty is to be determined, where relevant, as an issue of fact. Second, that the methodology used by the district court to determine the amount of earnings lost by the transfer of broker of credit letters, including the factual premises of business retention rates upon which it depended, are legally acceptable means for making the determination.

 In determining whether Rothenberg breached his fiduciary duty to AFG and Herman in ways that in fact caused AFG to incur lost earnings by the transfer of broker of record letters, the court should keep in mind that the duty may continue after termination of the employment relationship. *See Abbott Redmont*, 475 F.2d at 88 (so holding in applying New York law). Such a continuing duty may, in appropriate circumstances, include the specific duty not to divert business in which a former employer has the requisite "tangible expectancy," *see id.*, and the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment. *See id.* at 89; *see generally* Restatement (Second) of Agency § 396 (1958). We mention this continuing-duty principle not as an expression of opinion on the merits but only because, having expressly recognized its possible relevance, the magistrate judge seemed to confine his consideration of fiduciary duty breaches by Rothenberg to those occurring during his employment by AFG.

Finally, we leave to the district court's discretion whether to consider the fiduciary duty claim on the basis of the present or a reopened evidentiary record.

SO ORDERED.